## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRISTOL-MYERS SQUIBB CO., <br> E. R. SQUIBB & SONS, L.L.C., <br> ONO PHARMACEUTICAL CO., LTD., and <br> TASUKU HONJO, | ) <br> ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | C.A. No. 1:14-cv-01131-GMS |
| v. | ) <br> ) | |
| MERCK & CO., INC. and <br> MERCK SHARP & DOHME CORP., | ) <br> ) <br> ) | |
| Defendants. | ) <br> ) | |
| BRISTOL-MYERS SQUIBB CO., <br> E. R. SQUIBB & SONS, L.L.C., <br> ONO PHARMACEUTICAL CO., LTD., and <br> TASUKU HONJO, | ) <br> ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | C.A. No. 15-cv-00560-GMS |
| v. | ) <br> ) | |
| MERCK & CO., INC. and <br> MERCK SHARP & DOHME CORP., | ) <br> ) <br> ) | |
| Defendants. | ) <br> ) | |
| BRISTOL-MYERS SQUIBB CO., <br> E. R. SQUIBB & SONS, L.L.C., <br> ONO PHARMACEUTICAL CO., LTD., and <br> TASUKU HONJO, | ) <br> ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | C.A. No. 15-cv-00572-GMS |
| v. | ) <br> ) | |
| MERCK & CO., INC. and <br> MERCK SHARP & DOHME CORP., | ) <br> ) <br> ) | |
| Defendants. | ) | |

## DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

I.     NATURE AND STAGE OF THE PROCEEDINGS ...........................................................1

II.    SUMMARY OF ARGUMENT...................................................................................................2

III.   STATEMENT OF FACTS ..........................................................................................................2

IV.    ARGUMENT.................................................................................................................................4

      A.    Standard for Claim Construction ..........................................................................4

      B.    Agreed Proposed Constructions............................................................................5

      C.    Disputed Constructions ...........................................................................................5

            i.     The preambles of the asserted independent claims are limiting .................7

            ii.    "[for treatment of / of treating] a [tumor / melanoma / lung cancer / metastatic melanoma" (all asserted '474, '999, and '994 claims) ................8

            iii.   "treats the [lung cancer / metastatic melanoma]" (all asserted '999 and '994 claims) .................................................................................................11

            iv.    "pharmaceutically effective amount" (all asserted '474 claims)  / "effective amount" (all asserted '994 claims)...........................................12

            v.     "binds to . . . PD-1" (claims 2–5, 9, 12, 13 of the '474 patent) .................13

            vi.    "tumor proliferation" (claim 12 of the '474 patent) ...................................15

            vii.   "tumor metastasis" (claim 13 of the '474 patent) ......................................16

            viii.  "expresses [PD-L1/PD-L2]" (claims 19-20, 24-27, 29-30 of the '999 patent; claims 14-15, 19-20, 25-26 of the '994 patent); "[PD-L1/PD-L2] expression" (claims 26-27, 29-30 of the '999 patent; claims 25-26 of the '994 patent)...............................................................18

V.     CONCLUSION............................................................................................................................19

ME1 22068607v.1

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Arthur A. Collins, Inc. v. N. Telecom Ltd.*,
    216 F.3d 1042 (Fed. Cir. 2000)..................................................................5

*Eaton Corp. v. Rockwell Int'l Corp.*,
    323 F.3d 1332 (Fed. Cir. 2003)..................................................................7

*Griffin v. Bertina*,
    285 F.3d 1029 (Fed. Cir. 2002)................................................................11

*Kumar v. Ovonic Battery Co.*,
    351 F.3d 1364 (Fed. Cir. 2003)..................................................................5

*Mayo Collaborative v. Prometheus Labs.*,
    132 S. Ct. 1289 (2012)..............................................................................1

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)..............................................4, 5

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999)..............................................................4, 7

*Proveris Sci. Corp. v. Innovasystems, Inc.*,
    739 F.3d 1367 (Fed. Cir. 2014)..................................................................7

*Teva Pharms. USA, Inc. v. Sandoz Inc.*,
    135 S. Ct. 831 (2015)............................................................................4, 5

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)....................................................................4

**Statutes**

35 U.S.C. § 101............................................................................................1

**Other Authorities**

Fed. R. Civ. Proc. Rule 12(b)(6) ..................................................................1

ME1 22068607v.1

## I.      NATURE AND STAGE OF THE PROCEEDINGS

Defendants Merck & Co., Inc. and Merck Sharp & Dohme Corp. (collectively, "Merck")

submit this opening brief in support of their proposed claim constructions for the disputed claim

terms identified in the parties' Joint Claim Construction Chart.  *E.g.*, Case No. 14-1131, D.I. 74.[1]

Plaintiffs allege that Merck induces or contributes to infringement of the '474, '999, and

'994 patents by making and selling pembrolizumab, a biologic product that Merck sells in the

United States under the name Keytruda® for treatment of certain patients with melanoma or non-

small-cell lung cancer.  The '474 patent claims methods of treating a tumor or a melanoma in a

patient, the '999 patent claims methods of treating a lung cancer and the '994 patent claims

methods of treating a metastatic melanoma.[2]

Merck has moved to dismiss the actions involving the '994 and '999 patents under

F.R.C.P. Rule 12(b)(6) because the asserted claims in these patents are invalid under 35 U.S.C.

§ 101.  *See* Case No. 15-560, D.I. 5; Case No. 15-572, D.I. 5.  The claims of those patents, like

those of the '474 patent, do not recite any novel parameter of a treatment process, nor do they

recite any novel feature or property of an anti-PD-1 antibody.  That, in turn, makes the processes

claimed in each patent indistinguishable from the natural processes that occur in the body when

the PD-1 pathway is not activated or is blocked; namely, the body's immune system kills

pathogens, such as cancer cells, that it encounters.  *See Mayo Collaborative v. Prometheus Labs.*,

---

[1]      Plaintiffs Bristol-Myers Squibb Co., E. R. Squibb & Sons, L.L.C., Ono Pharmaceutical Co., Ltd., and Tasuku Honjo filed case number 14-1131 on September 4, 2014, alleging infringement of U.S. Patent No. 8,728,474 ("the '474 patent") by Merck.  D.I. 1 ("Complaint"). Plaintiffs later filed case number 15-560 on June 30, 2015, alleging infringement by Merck of U.S. Patent No. 9,067,999 ("the '999 patent"), and case number 15-572 on July 7, 2015, alleging infringement by Merck of U.S. Patent No. 9,073,994 ("the '994 patent").

[2]      The specification and drawings of the '474, '999, and '994 patents are the same.

132 S. Ct. 1289, 1296-97 (2012).  None of the claim construction disputes in this case implicate the deficiencies identified in Merck's motions to dismiss.

## II.      SUMMARY OF ARGUMENT

The proper construction of each disputed term in this case is resolved by resort to the claim language, the intrinsic evidence or the ordinary scientific meaning of the disputed terms.

Several disputes center on the meaning of the claim terms "treatment," "treating" and "treats" and the related concept of administering "a pharmaceutically effective" or "effective" amount of an anti-PD-1 antibody or composition.  The language in the claims, coupled with the specification's explanation of what treatment involves, compel the conclusion that these terms require the administered antibody to reduce the proliferation or metastasis of the cancer cells that make up the tumor, melanoma, lung cancer or metastatic melanoma in each patient or human.

Other disputes are similarly resolved.  For example, both parties agree that an anti-PD-1 antibody "binds to PD-1, is produced by a single clone," and "binds to" PD-1 by interacting with PD-1.  Plaintiffs, however, seek to add another requirement: that the antibody form a "direct" interaction with PD-1.  But that construction contradicts the patent disclosure, which describes interactions as being "direct *or indirect*."  The remaining terms in dispute—"expression of PD-L1/L2," "tumor proliferation," and "tumor metastases"—have ordinary scientific meanings that comport only with Merck's proposed constructions.

## III.     STATEMENT OF FACTS

The patents concern therapeutic methods which use the body's natural ability to defend itself against disease.  That capability derives from the body's immune system, which can target and kill cells that are harmful to the body—including cancer cells.  *See* Declaration of Ulrich von Andrian ("UVA Dec.") ¶¶ 10-16.  T cells are a central component of the immune system, and can

ME1 22068607v.1

selectively target and kill these harmful cells.  *Id.* ¶¶ 12-16.  To do that, the T cells first recognize

structures on the harmful cells that uniquely identify those cells.  *Id.* ¶ 13.  Then, the T cells

undergo a transformation to become "activated" T cells, which enables them to kill or direct the

killing of the targeted cells to which they have bound.  *Id.* ¶¶ 14-16.

        Activated T cells are carefully regulated in the immune system; they can cause a variety

of problems, including autoimmune diseases, if they recognize the body's own cells as harmful.

UVA Dec. ¶ 17.  One way the body regulates activated T cells is with so-called "inhibitory

receptors"—proteins that are expressed on the surface of the activated T cells and interact with

proteins on other types of cells.  *Id.* ¶¶ 19-20.  PD-1 is one example of an inhibitory receptor.

Complaint ¶ 3; UVA Dec. ¶ 21.  It interacts with two other proteins, called PD-L1 and PD-L2,

that are expressed by various types of cells, including certain types of cancer cells.  Complaint

¶ 14; UVA Dec. ¶¶ 23-25.  When PD-1 proteins on a T cell interact with PD-L1 or PD-L2

proteins on another cell, the PD-1 receptor sends a chemical signal to the T cell which renders

the T cell inactive.  Complaint ¶ 3; UVA Dec. ¶ 22.  The PD-1 receptor is sometimes called an

immune system "checkpoint"—if the checkpoint is triggered, it shuts down the activated T cells.

        In normal circumstances, the body's immune system will detect and destroy cancer cells.

UVA Dec. ¶¶ 11, 16.  But "[c]ancer cells can exploit the PD-1 protein's ability to trigger the

immune checkpoint" by producing the PD-L1 or PD-L2 proteins.  Complaint ¶ 3; *see also* UVA

Dec. ¶¶ 25, 51.  When an activated T cell encounters a cancer cell with PD-L1 or PD-L2 on its

surface, the T cell becomes inactive.  UVA Dec. ¶ 22.  Thus, by producing PD-L1 or PD-L2

proteins, cancer cells trigger the PD-1 immune checkpoint and avoid destruction.  *See* Complaint

¶ 3; *see also* UVA Dec. ¶¶ 25, 51.  Because "cancer cells have the ability to 'turn off' the immune

system," this allows "the cancer cells to continue to grow unchecked."  Complaint ¶ 1; *see also*

3

UVA Dec. ¶¶ 25, 51.

## IV.    ARGUMENT

### A.    Standard for Claim Construction

The claims of a patent delineate the scope of the invention, and interpretation of patent claims is "'exclusively' for 'the court' to determine." *Teva Pharms. USA, Inc. v. Sandoz Inc.*, 135 S. Ct. 831, 835 (2015) (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996)).  "[T]he words of a claim are generally given their ordinary and customary meaning," which is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (quotation marks omitted). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.

The primary guidance for claim construction must be the claims themselves. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999).  "[T]he context in which a term is used in the asserted claim can be highly instructive" to the court. *Phillips*, 415 F.3d at 1314.  "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Id.*  In addition to evaluating claim language, the court "must . . . read [the claims] in view of the specification, of which they are a part." *Id.* at 1315 (quoting *Markman v. Westview Instruments Inc.*, 52 F.3d at 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370).  The specification "is the single best guide to the meaning of a disputed term" and usually "is dispositive." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

4

Further, a court may consider relevant intrinsic evidence such as the patent prosecution history. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. Prior art cited in a patent or in its prosecution history also constitutes intrinsic evidence. *See Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003). "When prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning." *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000). The Supreme Court has recognized that courts may also "need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence such as learned treatises and dictionaries can explain "what a person of ordinary skill in the art would understand claim terms to mean." *Phillips*, 415 F.3d at 1319.

### B.   Agreed Proposed Constructions

The parties agree on proposed constructions for two terms:

(i)   an "*anti-PD-1 monoclonal antibody*" means an "*antibody that binds to PD-1 and is produced by a single clone*" and

(ii)   "*suppressed*" means "*inhibited.*"

*See* Joint Claim Construction Chart at 3. Merck respectfully asks the Court to adopt these undisputed proposed constructions.

### C.   Disputed Constructions

The parties dispute the meanings of seven claim terms and whether the preambles of the

5

independent claims are limiting.  Before addressing those disputed terms, it is important to appreciate the structure used by the four independent claims:  claims 1 and 8 of the '474 patent, and claim 1 in each of the '999 and '994 patents.

All of the asserted independent claims recite a single action to be taken: administer an anti-PD-1 antibody or composition.  The distinctions between the claims arise primarily from the language in each that specifies *what* is being treated by the method.  In the '474 patent, that object of treatment is set forth only in the preamble of claims 1 and 8, which read, respectively:

> A method for ***treatment of a tumor*** in a patient, comprising administering to the patient a pharmaceutically effective amount of an anti-PD-1 monoclonal antibody; and

> A method for ***treatment of a melanoma*** in a patient, comprising administering to the patient a pharmaceutically effective amount of an anti-PD-1 monoclonal antibody.

In the independent claims of the '999 and '994 patents, the object of the treatment is identified both in the preamble and in a "wherein" clause in the body of the claims, which read, respectively:

> A method of ***treating a lung cancer*** comprising administering a composition comprising a human or humanized anti-PD-1 monoclonal antibody to a human with the lung cancer, wherein the administration of the composition ***treats the lung cancer*** in the human; and

> A method of ***treating a metastatic melanoma*** comprising intravenously administering an effective amount of a composition comprising a human or humanized anti-PD-1 monoclonal antibody and a solubilizer in a solution to a human with the metastatic melanoma, wherein the administration of the composition ***treats the metastatic melanoma*** in the human.

The claims, notably, do not identify any properties or physical features of anti-PD-1 antibodies,

ME1 22068607v.1

other than that these antibodies provide the functional effect of "treating" the specified type of cancer cells.  Likewise, the claims recite no novel process for administering the anti-PD-1 antibody or composition.  The claims recite only that antibodies are to be administered or administered intravenously.

### i.      The preambles of the asserted independent claims are limiting

The first disagreement between the parties is whether the language in the preambles of the independent claims has a limiting effect on the claims. Merck contends it does, while Plaintiffs contend it does not.[3]

"When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003).  Likewise, a preamble is limiting if it is "necessary to give life, meaning and vitality to the claims."  *Pitney Bowes*, 182 F. 3d at 1305 (quotation marks omitted).

These standards establish that the preambles in the independent claims of the '474 patent are limiting.  One cannot know what a "pharmaceutically effective amount of an anti-PD-1 monoclonal antibody" is without turning to the preamble—it is an amount sufficient to treat "a tumor" (claim 1) or "a melanoma" (claim 8) "in a patient."[4]  The preambles thus provide context necessary to determine the meaning of each claim.

---

[3]      The preambles of the independent claims of the '999 and '994 patents have a similar structure that identifies what is being treated by administration of an anti-PD-1 antibody or composition. These claims also include language in the body of the claims that independently requires this result; each contains an additional clause in the body of the claim stating that administration of the anti-PD-1 antibody or composition treats the specified disorder.

[4]      In fact, the language in the preambles of the two claims is the only thing that differentiates these two claims in the '474 patent; each recites the identical step: "administering to the patient a pharmaceutically effective amount of an anti-PD-1 monoclonal antibody."

7

Likewise, a preamble is limiting "when it recites particular structure or steps that are highlighted as important by the specification." *Proveris Sci. Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1372 (Fed. Cir. 2014). That principle also holds true here. The specification repeatedly emphasizes that blocking PD-1 signaling causes T cells to prevent the growth or metastases of *cancer cells*—the cells that make a "tumor" or "melanoma" a *cancer*. *See* '474 patent, col. 2:62-67 ("The present inventors . . . found that substances that inhibit the inhibitory signals of PD-1, PD-L1 or PD-L2 *inhibit cancer proliferation* through the mechanism of the recovery and activation of immune function."); *id.* at col. 10:42-47 ("a substance that demonstrates *remarkable suppression of cancer proliferation* . . . ." The preamble is the only place in the independent claims of the '474 patent that mentions cancer, and it does so by calling for treatments of two physical manifestations of cancer: a "tumor" and a "melanoma."

Consequently, because the preambles provide context necessary to determine the meaning of key terms used in the body of each claim and recite steps highlighted in the specification, the preambles in these claims are limiting.

ii.     **"[for treatment of / of treating] a [tumor / melanoma / lung cancer / metastatic melanoma"** (all asserted '474, '999, and '994 claims)**

| Plaintiffs' Proposed Construction | Merck's Proposed Construction |
|---|---|
| **"The act or manner of treating a [tumor, melanoma, lung cancer, or metastatic melanoma]."** | **"to reduce proliferation or metastasis of cancer cells in the [tumor / melanoma / lung cancer / melanoma and melanoma metastases]"** |

Plaintiffs propose a circular definition of "for treatment of" and "of treating": both mean simply "the act or manner of treating . . . ." Plaintiffs' construction provides no insight into what "treatment" or "treating" actually means in the context of the claims and will not assist the Court or a jury in explaining what the claims do or do not require. By contrast, Merck's proposed

8

construction tracks both the claim language and explanations in the specification that specify what "treatment of" and "treating" the specified disorders actually entails.

The claim language expressly identifies what is being treated in each of the claimed methods: a particular manifestation of cancer. In the '474 patent, the claims state that administering the anti-PD-1 antibody is "for treatment of *a tumor* in a patient" (claim 1) or "for treatment of *a melanoma* in a patient" (claim 8). The '999 and '994 patents likewise identify the disorder as what is being treated by each method: claim 1 of the '999 patent states the method is " . . . for treating a *lung cancer* . . .", while claim 1 of the '994 patent states it is " . . . for treating *a metastatic melanoma* . . . ."

What "treatment" constitutes is explained in the specification—administering anti-PD-1 antibodies causes T cells to suppress the proliferation or metastasis of the cancer cells. Indeed, the specification consistently equates "treatment" with these effects on cancer cells. For example, the specification explains that anti-PD-1 antibodies are one of several types of substances that "inhibit the inhibitory signals of PD-1, PD-L1 or PD-L2" and thereby "*inhibit cancer proliferation* through the mechanism of the recovery and activation of immune function." '474 patent, col. 2:62-67. It likewise explains that anti-PD-1 antibodies are "a substance that demonstrates *remarkable suppression of cancer proliferation* . . ." and that analogous agents "presented *suppression of proliferation*, invasion, and *metastasis* of *carcinoma cells*, and life prolongation of an individual." Thus, as the specification states:

> It was suggested that inhibition of PD-1 function or production could achieve an effect similar to the effect on inhibition of PD-L1 function by this antibody. This is based on *non-proliferation of imported carcinoma cells* in the cancer imported model using PD-1-deficient mice, and presents that inhibition of PD-1 function or production *could be effective on cancer treatment* (Example 5 and FIG. 3).

9

'474 Patent at col. 10:60-67.  According to the specification, causing "non-proliferation of imported cancer cells" was evidence that inhibition of PD-1 function was an effective way to provide *cancer treatment*.

Experimental results in the patent also reflect the same emphasis on suppression of proliferation of *cancer cells* as being cancer treatment.  The specification reports (in Example 1) that "inhibition of PD-1 and PD-L1 signal by inhibiting PD-L1 function could reinforce *cytotoxic activity to carcinoma cells*."  *Id.* at col. 19:41-45.  In other words, blocking PD-1 signaling with an anti-PD-L1 antibody[5] increased T cell-mediated killing of cancer cells.  *Id.*  In Examples 3 and 5, the specification likewise reports that "[a]dministration of anti-PD-L1 antibody *suppressed carcinoma cell growth*" (Example 3) and that "[a]dministration of anti-PD-L1 antibody *suppressed* PD-L1-expressing J558 *carcinoma cells proliferation*" (Example 5).  *Id.* at cols. 20:5-24, 20:38-55, respectively.

With regard to metastasis, the specification similarly explains that the effect of treatment is suppression of metastasis of cancer cells.  The specification contends "it had been proven that administration of anti-PD-1 antibody significantly *suppressed metastasis* of imported *carcinoma cells* to liver in the cancer imported animal model."  '474 patent, col. 11:1-4.  Example 13 similarly states that "*metastasis* of B16 melanoma cells *is suppressed*."  '474 patent, col. 25:10-11.  In each instance, the specification asserts that the effect of administration of the anti-PD-1 antibody is the *suppression* of metastasis of the *cancer cells*.

The patent disclosure thus consistently characterizes "treatment" or "treating" of the variously claimed manifestations of cancer as being the suppression of proliferation or of

---

[5]     Notably, none of these examples show the effects of an anti-PD-1 antibody.

metastasis of *cancer cells*.  This, as the specification explains, is because anti-PD-1 antibodies[6] suppress PD-1 inhibitory signaling in T cells, and when that happens, the body's immune system targets and kills the cancer cells which are responsible for the progression of these different forms of cancer.  Thus, a method "for treatment of" a tumor or melanoma or "of treating" a lung cancer or metastatic melanoma means a process that reduces the proliferation or metastasis of cancer cells in the [tumor / melanoma / lung cancer / melanoma and melanoma metastases].

### iii.   "treats the [lung cancer / metastatic melanoma]" (all asserted '999 and '994 claims)

| Plaintiffs' Proposed Construction | Merck's Proposed Construction |
|---|---|
| **"The act or manner of treating a [lung cancer / metastatic melanoma]."** | **"reduces proliferation or metastasis of cancer cells in the [lung cancer] / [melanoma and melanoma metastases]"** |

The parties also dispute the meaning of the term "treats" which appears in a "wherein" clause at the end of the independent claims of the '994 and '999 patents.  Merck's construction is the only one that comports with how the term "treats" is used in these claims, and the only one that reflects what the specification explains treatment to mean.

In each claim, the "wherein" clause requires a particular effect on the disorder specified in the claim.  Thus, claim 1 of the '994 patent states "*wherein* the administration of the composition *treats the lung cancer* in the human," while claim 1 of the '994 patent states "*wherein* the administration of the composition *treats the metastatic melanoma* in the human."

These "wherein" clauses are plainly limiting.  Each requires that a specific result be

---

[6]     The patent disclosure contains an extremely limited discussion of anti-PD-1 antibodies (the subject of the claims), and instead relies on work done with different types of agents (*i.e.*, anti-PD-L1 antibodies) or with animal models (*e.g.*, transgenic mice that do not produce the PD-1 receptor).  *See, e.g.*, '474 patent, cols. 20:5-26 (Example 3); 20:28-36 (Example 4); 21:30-62 (Example 7); Fig. 3(A).

achieved.  *See Griffin v. Bertina*, 285 F.3d 1029, 1033 (Fed. Cir. 2002) (holding "wherein" clauses were limiting because "they relate back to and clarify what is required by the [claim]" and give "meaning and purpose" to the recited method steps).

As explained in the preceding section, treatment according to the specification means that T cells will suppress the proliferation or metastasis of the cancer cells in the lung cancer or the metastatic melanoma.  By using the active form of the term "treats" in the claims and by expressly stating this is the result that must be realized, the claims expressly require the administration of the anti-PD-1 antibody or composition to cause a reduction in the proliferation or the metastasis of those cancer cells.  Merck's construction is the only one that comports with both this explicit claim language and the patent disclosure.  Merck's proposed construction should therefore be adopted.

> iv.   "pharmaceutically effective amount" (all asserted '474 claims) /
> "effective amount" (all asserted '994 claims)

| Plaintiffs' Proposed Construction | Merck's Proposed Construction |
|---|---|
| **"An amount sufficient to exert the pharmacological action of the drug."** | **"amount sufficient to reduce proliferation or metastasis of cancer cells in the [tumor / melanoma / metastatic melanoma and melanoma metastases]"** |

The next dispute concerns the meaning of the term "pharmaceutically effective amount" as used in the claims of the '474 patent and "effective amount" as used in the claims of the '994 patent.  Plaintiffs again propose a circular definition that provides no value to the Court or a jury in determining whether the requirements of the claims are met.  Plaintiffs' construction does not identify what "the pharmacological action" of the drug is, which makes it impossible to determine whether "an amount sufficient to exert" that unspecified effect has been provided to a patient or human.  Plaintiffs' construction thus is unusable and confusing, and cannot be

12

reconciled with the patent disclosure.

In contrast, Merck's proposed construction employs what the specification identifies as the consequence of administering the anti-PD-1 antibody: a reduction in the proliferation or the metastasis of cancer cells in the tumor, melanoma, lung cancer, or metastatic melanoma. Merck's construction thus identifies the result that must be achieved in treating the tumor, melanoma, lung cancer or metastatic melanoma, which is the prerequisite of determining how much of an anti-PD-1 antibody composition must be administered to the patient or the human to be "effective" in achieving that result (*i.e.*, a "pharmaceutically effective" or "effective" amount).

<strong>v.        "binds to . . . PD-1" (claims 2–5, 9, 12, 13 of the '474 patent)</strong>

| Plaintiffs' Proposed Construction | Merck's Proposed Construction |
|---|---|
| **"To form a direct interaction with PD-1."** | **"interacts with . . . PD-1"** |

The term "binds to" refers to what the anti-PD-1 monoclonal antibody does when it encounters the human PD-1 protein. In simple terms, the anti-PD-1 antibody "interacts with" the PD-1 protein. Both parties agree that "binds to" means that the antibody "interacts with PD-1." Plaintiffs' proposed construction arbitrarily restricts the types of interactions that may occur between a PD-1 antibody and PD-1 to one of two types of protein-protein interactions identified in the specification—a "*direct*" but not "*indirect*" interaction. Plaintiffs' proposed construction thus adds an arbitrary additional condition, which is inconsistent with the disclosure and will only cause confusion.

The specification certainly does not make this arbitrary distinction; it characterizes protein-protein "interactions" as being "direct *or indirect*." *See, e.g.*, '474 patent, col. 5:4-19 (indicating that an interaction between PD-1 and PD-L1 or between PD-1 and PD-L2 can be "direct *or indirect*."). Thus, according to the specification, protein-protein interactions, such as

13

the interactions between an antibody (*e.g.*, an anti-PD-1 antibody) and an antigen (*e.g.*, PD-1), may be either "direct *or indirect*" in nature.

The term "interaction" is used throughout the patent disclosure in this precise manner. For example, the specification uses the word "interaction" to describe the binding of "PD-1 to PD-L1" and "PD-1 to PD-L2."  '474 patent, cols. 2:67-3:6, 5:3-19 ("[t]he immunosuppressive signal of PD-1 . . . in the present invention is at least composed of *the interaction of* PD-1 and PD-L1 or PD-1 and PD-L2 . . . .").  The specification similarly describes an anti-PD-1 antibody as an "*interaction* inhibitor of PD-1 and PD-L1 or PD-1 and PD-L2."  '474 patent, cols. 3:22-31, 3:40-47, 3:65-4:6, 4:17-24.

The prosecution history also supports Merck's proposed construction.  For example, the first priority application in the patent family indicates that "in vitro screening" may be used to identify "a substance that inhibits the interaction between PD-1 and PD-L1," one of the types of anti-PD-1 antibodies referred to in the patent. JP 2002-194491 ¶ [0033].  It then explains this type of assay can be performed using a "BIA core" instrument, which the patent explains measures protein *interactions* (without modifiers).  *See id.* ¶ [0034] ("a protein *interaction* measurement method using a Biacore device.").  In addition, prior art cited during the prosecution of the patents similarly uses the term "interaction" without modifiers when explaining how a Biacore device functions, indicating such devices can be used to determine the association and dissociation rates of an "*antibody-antigen interaction*."  WO 2006/121168 at 19.

Plaintiffs' proposed construction would improperly limit the scope of the claims to one of the two types of binding interactions disclosed in the specification.  Merck's proposed construction does not contain such a limitation and should therefore be adopted.

14

vi.      "tumor proliferation" (claim 12 of the '474 patent)

| Plaintiffs' Proposed Construction | Merck's Proposed Construction |
|---|---|
| **"Increase in the number of tumor cells."** | **"the increase in the number of cancer cells in the tumor"** |

The sole dispute between the parties over the meaning of "tumor proliferation" is whether the increase being observed with proliferation is in the number of "*tumor* cells" or in the "number of *cancer* cells *in the tumor*." The only construction that comports with a scientifically plausible meaning of the term is Merck's proposed construction.

A tumor arises from the abnormal growth of cells. UVA Dec. ¶¶ 26-28. Many tumors are benign—they do not invade other parts of the body and often can be removed surgically. *Id.* ¶ 29. Tumors that are associated with cancer are called "malignant" tumors. *Id.* ¶ 30. These are tumors that contain cancer cells. *Id.* While tumors (including malignant tumors) typically contain many other types of cells, it is the cancer cells in the tumor that are the problem. *Id.* ¶¶ 31-32. Cancer cells are the cells in the tumor that grow uncontrollably, drive the growth of the tumor, and ultimately present the health risk to the patient. *Id.* ¶¶ 26, 30, 33.

Merck's proposed construction relies on these accepted scientific understandings about tumors, and which types of tumors would be relevant to the claimed methods. It also relies on the explanations in the specification that the claimed treatment methods work by causing T cells to attack and kill *cancer cells*, as explained above in section ii. From these, the meaning of "tumor proliferation" is clear: it is the increase in the number of *cancer cells* in the tumor.

Plaintiffs' proposed construction would only introduce confusion. For example, it does not differentiate between non-malignant and malignant tumors; "tumor cells" are found in both. The specification also makes crystal clear that the purpose of administering anti-PD-1 antibodies

15

is to treat *cancer* cells.  *See, e.g.*, '474 patent, cols. 20:5-24, 20:38-55.  Cells in a tumor that are

not cancer cells are not the target of treatment according to the specification.  There is simply no

need to introduce confusion by employing Plaintiffs' scientifically imprecise construction,

particularly in view of the clarity in the disclosure that the treatment methods cause T cells to

attack *cancer cells*.

### vii.   "tumor metastasis" (claim 13 of the '474 patent)

| *Plaintiffs' Proposed Construction* | *Merck's Proposed Construction* |
|---|---|
| **"The spread of cancer cells from a primary site of disease to other parts of the body."** | **"the development of a tumor derived from the primary tumor at a location outside the primary tumor site"** |

The dispute over the term "tumor metastasis" again pits an accepted scientific definition

of the term (Merck's) against one that is scientifically imprecise, confusing and in conflict with

the patent disclosure and the claims (Plaintiffs').

The term "tumor metastasis" has a well-accepted scientific meaning; it is the

development of a second tumor derived from a primary tumor but at a different location in the

body.  UVA Dec. ¶ 44 (quoting Taber's Cyclopedic Medical Dictionary, 17th ed. 2001 ("The

usual application [of the term metastasis] is to the manifestation of a malignancy as a secondary

growth arising from the primary growth at a new location.")).  This meaning is compelled by the

process of tumor metastasis, which occurs when individual cancer cells escape from the primary

tumor, migrate to another location in the body, and form a new tumor at that other location.  *Id.*

¶¶ 40-47.  Indeed, an accepted characteristic of a metastasis is that it is made up of cancer cells

that can be genetically linked to cancer cells in the primary tumor of the patient.  *Id.* ¶ 45.

The specification does not define "metastasis."  It does, however, refer to certain

experimental results as being examples of metastasis which conform to Merck's construction.

For instance, in Example 2, the specification states that P815 cancer cells had "permeate[d] across the peritoneal cavity and the abdominal cavity, and further ***those metastases*** to liver and spleen."  '474 patent, cols. 19:47-20:3.  The specification thus labels the development of a secondary tumor derived from P815 tumor cells in the liver and spleen—locations outside the primary tumor site, which was the peritoneal cavity—as being indicative of metastasis.

Plaintiffs' construction not only ignores the required causal relationship between two tumors that is the defining characteristic of a "tumor metastasis" (*i.e.*, that cells from the primary tumor form the secondary tumor), UVA Dec. ¶ 45, it would simply eliminate the requirement that a secondary tumor be formed, which is a prerequisite of metastasis.  *Id.* ¶¶ 44-45.  This is the consequence of Plaintiffs' proposal to use the vague and imprecise phrase "primary site of disease"—a phrase nowhere found in the patent disclosure—instead of the scientifically accepted term "primary tumor."

Plaintiffs' construction also would effectively remove any distinction between the claim terms "tumor metastasis" and "tumor proliferation."  Under Plaintiffs' construction, simply finding cancer cells in two different places in the body ("sites of disease") would satisfy both claim terms, as doing so would demonstrate that cancer cells had increased in number and had moved.  Equating the meaning of these two terms would not only be scientifically confusing, it would be legally improper, given that the two claim terms are presented as distinct terms, and refer to different types of diseases in the specification.

17

> **viii.** **"expresses [PD-L1/PD-L2]" (claims 19-20, 24-27, 29-30 of the '999 patent; claims 14-15, 19-20, 25-26 of the '994 patent); "[PD-L1/PD-L2] expression" (claims 26-27, 29-30 of the '999 patent; claims 25-26 of the '994 patent)**

| *Plaintiffs' Proposed Constructions* | *Merck's Proposed Constructions* |
|---|---|
| **"produces a product of the [PD-L1/PD-L2] gene"**<br><br>**"production of a product of the [PD-L1/PD-L2] gene"** | **"produces a detectable amount of [PD-L1/PD-L2] protein"**<br><br>**"production of a detectable amount of [PD-L1/PD-L2] protein"** |

The dispute over "expression" of PD-L1/PD-L2 centers on whether the cancer cells must produce a detectable amount of the PD-L1 or PD-L2 *protein* (Merck's construction) or whether those cancer cells can produce any amount of any "product" of the PD-L1 or PD-L2 "gene" (Plaintiffs' construction).  Only the former is consistent with the claims and the disclosure.

The claims using this term[7] state that cancer cells express PD-L1 or PD-L2, and certain of these claims add that this expression is to be detected by "immunohistochemistry."  The term "immunohistochemistry" is not used in the disclosure, but generally refers to a technique which uses an antibody to detect the presence of *a protein* on a tissue sample.[8]  *See* UVA Dec. ¶¶ 51-57.  The specification also makes clear that cancer cells must produce PD-L1 and PD-L2 proteins to cause inhibitory signaling, which signaling is the result of the PD-L1 or PD-L2 proteins on the cancer cells interacting with PD-1 proteins on the T cells.  *See, e.g.*, '474 patent, col. 5:4-7 ("The immunosuppressive signal of PD-1 . . . in the present invention is at least composed of the interaction of PD-1 and PD-L1 or PD-1 and PD-L2.").  Because the claims refer to cancer cells

---

[7]    Claims 19, 20, 24-27 and 29-30 of the '999 patent, and claims 14, 15, 19, 20, 25 and 26 of the '994 patent.

[8]    Immunohistochemistry is illustrated in Example 8 of the patent, which shows different types of tissues being stained with different antibodies to detect the presence of the different *proteins* that each antibody recognizes, including an anti-PD-1 antibody termed "J43."

expressing PD-L1 or PD-L2 in the context of a method to prevent that inhibitory signaling, especially in view of dependent claims indicating that such expression can be detected using immunohistochemistry, the claim language is clearly indicating that the cancer cells are producing a detectable amount of the PD-L1 or PD-L2 *protein*.

Plaintiffs' construction, by contrast, only introduces confusion.  First, the specification does not use the phrase "product of [the PD-L1/L2] gene" anywhere, much less use it to identify which cancer cells are to be treated.  Second, many "gene products" are created during the normal process of cellular replication; which ones are produced and how many of each would have to be produced to meet Plaintiffs' proposed construction is unknowable.  And the mere existence of "gene products" in a cancer cell does not mean the cancer cell is able to shut down T cells—the cancer cell must produce the PD-L1 or PD-L2 *protein*, which is what interacts with the PD-1 *protein* on the T cells to cause inhibitory signaling.  *See* UVA Dec. ¶ 51.  Plaintiffs' construction is thus unworkable, confusing and inconsistent with the specification.  Merck's proposed construction should therefore be adopted.

## V.    CONCLUSION

Merck respectfully requests that the Court adopt its proposed constructions and find that the preambles of the asserted independent claims are limiting.

19

Dated: February 25, 2016                    McCARTER & ENGLISH, LLP

                                            /s/ Daniel M. Silver
                                            _____
                                            Michael P. Kelly (#2295)
                                            Daniel M. Silver (#4758)
                                            Benjamin A. Smyth (#5528)
                                            405 N. King St., 8th  Floor
                                            P.O. Box 111
*Of Counsel:*                               Wilmington, DE 19899
                                            (302) 984-6385
David T. Pritikin                           mkelly@mccarter.com
William H. Baumgartner, Jr.                 dsilver@mccarter.com
Gwen Hochman Stewart                        bsmyth@mccarter.com
Lisa A. Schneider
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
(312) 853-7000
dpritikin@sidley.com
wbaumgartner@sidley.com
gstewart@sidley.com
lschneider@sidley.com

Jeffrey P. Kushan
Fitz B. Collings
Kirsten E. Braun
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000
jkushan@sidley.com
fcollings@sidley.com
kbraun@sidley.com

Todd L. Krause
Grace I. Chiang
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY  10019
(212) 839-5300
tkrause@sidley.com
gchiang@sidley.com

ME1 22068607v.1